AUGUSTA SONNEBORN, HENRY SONNEBORN, JR., SIEGMUND B. SONNEBORN, Executors, and AUGUSTA SONNEBORN and HENRY SONNEBORN, JR., Individually,

*vs.*

GEORGE H. HUTZLER and SEYMOUR MANDELBAUM, Two of the Executors of Henry Sonneborn, Deceased.

Where there is no necessity for employing counsel, making investigations, or instituting proceedings as to the condition of a testator's estate, counsel fees and other such expenses will not be allowed out of the estate.                p. 435

*Decided May 14th, 1919.*

Appeal from the Orphans' Court of Baltimore City.

The facts are stated in the opinion of the Court.

The cause was argued before Boyd, C. J., Briscoe, Burke, Thomas, Pattison, Urner, Stockbridge and Adkins, JJ.

*Joseph C. France* and *Sylvan H. Lauchheimer* (with whom was *Leon E. Greenbaum* on the brief), for appellants.

*Vernon Cook* and *Edmund L. Mooney,* of New York, (with whom was *W. L. Marbury* on the brief), for the appellees.

BURKE, J., delivered the opinion of the Court.

We do not find it necessary to discuss with any particularity, the testimony contained in the record of this case. There are certain outstanding and controlling facts, clearly established by the evidence, which are sufficient to enable us to dispose of the legal question presented by the appeal.

Henry Sonneborn, a prominent business man of Baltimore City died on the 26th day of December, 1917. He had been for many years engaged in the clothing manufacturing business, and was the founder of the firm of Henry Sonneborn and Company. He had been the senior member of that firm, and the larger part of its capital had been contributed by him. He had been twice married. He left surviving him his second wife, Augusta, and one son, Henry, a child of the second marriage, and two daughters,—Mrs. Seymour Mandelbaum and Mrs. Charles G. Hutzler,—the children of the first marriage. Mrs. Hutzler died before the institution of these proceedings.

The appraised value of the deceased's estate, as appears by the inventory filed in the Orphans' Court of Baltimore City, on the 5th day of April, 1918, was $641,486. Mr. Sonneborn left a last will and testament by which, after certain bequests, he devised and bequeathed his estate to his family, and appointed George H. Hutzler, his grandson, Seymour Mandelbaum, his son-in-law, Siegmund B. Sonneborn, his brother-in-law, Augusta Sonneborn, his wife, and Henry Sonneborn, his son, executors and trustees of his estate. There is no question in this case as to the validity or fairness of the will, which was duly admitted to probate and letters testamentary granted to the executors above named by the Orphans' Court of Baltimore City.

The inventory of the personal estate was signed by all the executors and was sworn to by Mr. Mandelbaum, one of the executors as "a true and perfect inventory of all and singular the goods and chattels of the said deceased that have come to his hands, knowledge or possession at the time of making thereof; that what has since or shall hereafter come to his hands, knowledge or possession he will return in an additional inventory; that he knows of no concealment, nor suspects any to be; that if he should hereafter discover any concealment, or suspect any to be, he will make the Register of Wills for Baltimore City acquainted therewith, that the same may be inquired into according to law." In this inventory no reference was made to any shares of common stock owned by the testator in the Henry Sonneborn & Company, Incorporated. This controversy concerns itself primarily, and, we may say, exclusively with certain shares of this stock which was issued under the following circumstances.

In the Fall of 1914, the members of the firm of Henry Sonneborn & Company decided to incorporate the business. In consequence of the depressed trade conditions, due to the war, the business of the firm in that year as compared with the previous year, showed a loss of a hundred thousand dollars. The firm had been a large borrower of money to carry its business, and at that time it was indebted to banks and various persons to an amount approximating one million, two hundred thousand dollars. The financing of the firm was in the hands of Siegmund B. Sonneborn, who had become the managing partner in 1899, and under whose management the business had expanded and prospered. The financing was done largely through New York bankers, and in the fall of 1914, Siegmund B. Sonneborn was advised by his bankers, that "owing to the war it might be quite possible that when we went into the market in January and February of 1915 and would be looking for our usual million or million and a half of accommodation in the open market, that we would not be able to sell our paper in the open market, and that it would be advisable to find some other means to do the financ-

ing of the concern." It was agreed that the best and most effective means to take care of the outstanding indebtedness and to provide the needed capital was by the incorporation of the business and the sale of stock of the corporation. Accordingly an agreement signed by all the parties, dated January 9th, 1915, was prepared by Mr. Edwin G. Baetjer which declared that it was the desire and intention of the parties thereto "to transfer said business to a corporation to be organized by them, and to provide such corporation with additional working capital."

The agreement provided: *first,* for the issue of one million dollars of first preferred 7% cumulative stock, redeemable through a sinking fund at the expiration of twelve years. The new capital was to be represented by this stock; *secondly,* for the issue of one million dollars of second preferred 7% stock. The invested capital of the partners was to be represented by this stock which was to be distributed among the partners according to their capital accounts; *thirdly,* an issue of two million, five hundred thousand dollars of common stock. This stock was not represented by any tangible assets, but had back of it only the good will and earning capacity of the business. A certain number of these shares were to be used as bonus in the sale of the preferred stock, and the remaining shares, which the evidence shows to have been nineteen thousand three hundred and seventy-one, were to be divided among the partners in accordance with the following provision of the agreement:

> "The common stock or such portion thereof as remains after making the provisions above set forth shall be divided among said partners in accordance with the provisions of said articles of co-partnership governing the distribution of profits, including as well such distribution during the lifetime of Henry Sonneborn as the distribution after his death, and so that during his life the said shares of common stock may be divided and held by said partners in the proportions in which they are entitled to the profits of said firm, and after his death the said division may be

changed and said common stock divided in the pro-
portions to which said partners are entitled to the
profits of said firm after his death."

It is, therefore, clear that it was the intention of Henry
Sonneborn: *first,* that he should hold his proportion of this
stock for the term of his natural life only; and *secondly,* that
at his death it should not constitute a part of his estate, but
should be "divided in the proportions to which said partners
are entitled to the profits of said firm after his death."

By an agreement dated January 19th, 1915, signed by all
the partners, and by Augusta Sonneborn, the wife of Henry
Sonneborn, and Camilla K. G. Sonneborn, the wife of Sieg-
mund B. Sonneborn, a change was made in the distribution
of the common stock. It was provided therein that:

"All of the said shares of second preferred stock
and common stock received by the co-partners of Henry
Sonneborn & Company under and by virtue of the
agreement with Henry Sonneborn & Company, Incor-
porated, dated February 19th, 1915, save the portion
thereof sold as aforesaid to said bankers, shall be dis-
tributed, assigned and transferred by the parties
hereto in the proportion and to the number following,
that is to say:

|  | Second Preferred Stock. | Common Stock. |
|---|---|---|
| Henry Sonneborn. . . . . . . . . . . . . . | 6,920 | . . . . . |
| Siegmund B. Sonneborn . . . . . . . . | 1 | 6,265 |
| Moses S. Sonneborn . . . . . . . . . . . | 1,574 | 3,632 |
| Adolph S. Roten . . . . . . . . . . . . . . | 1 | 2,421 |
| Jesse M. S. Heineman . . . . . . . . . | 625 | 1,210 |
| Henry Sonneborn, Jr. . . . . . . . . . . | 875 | 3,843 |
| Camille K. G. Sonneborn . . . . . . . | . . . . . | 1,000 |
| Augusta Sonneborn. . . . . . . . . . . . | . . . . . | 1,000 |
|  | 9,996 | 19,371 |

"Each of said parties shall be entitled to hold the shares above provided to be distributed and transferred to them absolutely as the absolute, separate and individual property of each of said parties, respectively, and free from all claims of any character of any other party hereto; and each of the parties hereto do hereby release each of the other parties from any claim that he might have to said shares or otherwise by virtue of any provision of said partnership articles or any other agreement between said parties fixing or relating to any distribution of the partnership assets in any other proportion, or providing for a change in the interest of said partners in the event of the death of Henry Sonneborn, or in any other event, it being intended that the distribution hereby made is a final one."

Mr. Hugo Steiner, a member of the Baltimore Bar, had been the personal counsel of Mr. Sonneborn for a number of years, and had drawn his will, and a few days after the testator's death, read it to the members of his family. He was employed by all the executors as appears by a petition filed in the Orphans' Court, to aid and advise them in the performance of their duties. Mr. Hutzler testified that shortly after the reading of the will he said to Siegmund B. Sonneborn that he was surprised to learn that no common stock of Henry Sonneborn & Company, Incorporated, was included in a statement of the assets of the estate presented by him, and that he replied: "Oh, that was given to Augusta and Henry as partners,—by that he meant his sister and her son, Henry." As to this conversation, Siegmund B. Sonneborn testified as follows: "Mr. Hutzler asked why did not the old gentleman have any common stock, and I told him the common stock had been distributed as provided for in the co-partnership papers, and that Mrs. Augusta Sonneborn received her share. Henry, his share and I received one-sixteenth."

The will was admitted to probate on the 2nd day of January, 1918, and presumably the executors qualified on that day.

A day or two after the grant of letters, Mr. Hutzler returned to New York where he resides. He said in his testimony that "realizing that some investigation might be needed on my part as executor to verify the assets, I concluded it was important to appoint counsel to assist me. I called upon Blandy, Mooney and Shipman, and discussed the matter with Mr. Edmund L. Mooney." He retained Mr. Mooney as counsel, and upon Mr. Mooney's recommendation he employed Mr. Farquhar J. MacRae, a New York expert accountant, "to investigate the books, expecially in connection with the common stock." Colonel Mandelbaum employed Mr. Vernon Cook, telling Mr. Steiner who represented all the executors in the settlement of the estate "to go ahead and attend to the estate and everything else connected with it. This is only in case of litigation we will have our own counsel. Just go ahead with the administration of the estate as if nothing occurred." Mr. MacRae came to Baltimore on two occasions and made an examination of the books of Henry Sonneborn and Company, for which he charged $751.64. On his first visit a private ledger of the firm, which had ceased to exist for about three years, could not be found, but was subsequently found and put in his possession. He had access to and examined all the books, and partnership agreements he called for, including the reports of Haskin and Sells, expert accountants, of the condition of the firm for five years prior to the incorporation, and as the result of both visits he testified that he would not say that anything had been concealed or suppressed.

The record contains certain correspondence between Mr. Cook and Siegmund B. Sonneborn in which Mr. Cook propounded certain questions relative to matters upon which he desired information. These questions appeared to have been fully and frankly answered and copies of all papers called for in the possession of Mr. Sonneborn furnished.

On August 31st, 1918, George H. Hutzler and Seymour Mandelbaum, two of the executors, filed a petition in the

Orphans' Court of Baltimore City against their three co-executors, in which they prayed:

"(1) That each and all of the executors of the estate be required to unite in signing a check for the payment of the bill of the said Farquhar J. MacRae hereinbefore mentioned.

"(2) That this Court may expressly ratify and approve the action of your petitioners in employing and continuing the employment of the said Farquhar J. MacRae for the purpose of making full investigation as to the matters hereinbefore mentioned.

"(3) That the action of your petitioners in employing counsel and continuing to employ the same to investigate the matters hereinbefore mentioned may be expressly ratified and approved by this Honorable Court.

"(4) That Siegmund B. Sonneborn, Augusta Sonneborn and Henry Sonneborn, Jr., be required to answer this petition within some reasonable time to be fixed by the Court, and to show cause, if any they have, why the prayer of the petition should not be granted."

It is necessary for a clearer understanding of the case to set out the following paragraphs of the petition:

"(4) That subsequent to the death of Henry Sonneborn, Siegmund B. Sonneborn caused to be prepared an inventory purporting to set forth a list of the securities of the said Henry Sonneborn, and that your petitioners, to their great surprise, discovered that according to the said list of said Henry Sonneborn he did not own any of the shares of common stock of Henry Sonneborn & Company, Incorporated, although he had built up said business and had owned by far the largest part of the capital of the firm which conducted said business. Upon inquiry, your petitioners further learned that the common stock of said corporation was largely owned and the corporation apparently controlled by Siegmund B. Sonneborn, Augusta Sonneborn and Henry Sonneborn, Jr. They further found that when said corporation was formed that the plan

of incorporation was that the partners of the firm, of whom there were several, received common stock of the corporation in the same proportion in which they had theretofore shared in the profits of the partnership, and that this principle had not been followed in the case of Henry Sonneborn; that although he had received a large share in the profits of the partnership and had the same rule been followed in his case as in the case of the others, he would therefore have received a large proportion of the common stock of the corporation, that this rule had not been followed, and the com mon stock which would have come to him, had he been treated as the other members of the firm, had in some way come into the possession of Siegmund B. Sonneborn, Augusta Sonneborn and Henry Sonneborn, Jr., and was claimed by them as their individual property.

"(5) That the stock in question is an extremely valuable asset. Your petitioners deemed it not only right, but their duty as two of the executors of the estate to make a complete investigation of this matter, each and all of their co-executors being personally interested in the same and thereby disqualified from acting for the estate in reference thereto. Your petitioner, George H. Hutzler, who is a resident of New York City, thereupon employed Messrs. Blandy, Mooney and Shipman as his attorneys, and your petitioner, Seymour Mandelbaum, employed Messrs. Hamon, Cook, Chesnut & Markell, said firms of attorneys being asked to co-operate in the matter. They advised your petitioners that it was their duty as executors to make an investigation as to the true ownership of the stock hereinbefore mentioned, which apparently should have come to the estate of Henry Sonneborn, but in fact had gotten into the possession of your petitioners' co-executors; that your petitioners were also advised that it was proper that an examination should be made by an accountant of the books of the firm of Henry Sonneborn & Company and Henry Sonneborn & Company, Incorporated, in order that every detail in reference to the issuing of the stock hereinbefore men-

tioned should be brought to light and fully investigated; that for that purpose Mr. Farquhar J. McRae, a duly qualified accountant, was employed, and that he visited the office of Henry Sonneborn & Company, Incorporated, for the purpose of making an investigation of the books hereinbefore mentioned. He was referred by Mr. Siegmund B. Sonneborn to a Mr. Phillip Hamburger, secretary of the corporation, and was later informed by the said Mr. Hamburger that the books of the firm of Henry Sonneborn & Company had been destroyed from time to time, were not in existence or could not be found, with the exception of two small books subsequently produced by Mr. Hamburger, one of which contained statistical records of the capital of the company from 1893 to 1915, balance sheets of the firm at the end of the fiscal periods were also found among the records.

"(6) Such examination as Mr. McRae was able to make also disclosed that there was another corporation known as the Sonneborn Realty Company, which owned the land and buildings occupied by Henry Sonneborn & Company, Incorporated, and was receiving a very large rental for the same; that the said Sonneborn Realty Company was apparently owned by Siegmund B. Sonneborn and other members of the old firm, to the exclusion of Henry Sonneborn, who had apparently been given no interest whatever therein.

"(7) Subsequent to the examination of Mr. McRae, counsel for your petitioners submitted a number of written inquiries to Mr. Siegmund B. Sonneborn, and one of these inquiries related to the destruction of the books of the old firm, and was for the purpose of ascertaining why, when and by whose order such destruction occurred. In reply to this, Mr. Siegmund B. Sonneborn stated that the essential books had not been destroyed; that at the time of Mr. McRae's examination some of the books could not be found, but that they had subsequently been located, and that all of the essential books were now available running back for a period of several years. Your petitioners there-

upon requested Mr. McRae to resume and continue
his investigation with the aid of the newly discovered
books. About the same time the said Mr. McRae pre-
sented a bill for his services in connection with his first
examination, amounting to seven hundred and fifty-
one dollars and sixty-four cents ($751.64); that your
petitioners believed this bill was a reasonable and
proper one, and that the same should be paid by the
estate. They presented to their co-executors for pay-
ment and the co-executors, acting through their per-
sonal counsel, Mr. Sylvan H. Lauchheimer, declined to
pay said bill.

"(8) Your petitioners are advised that the said bill
of the said Mr. McRae is a proper charge against the
estate; that the services rendered by him were neces-
sary and proper services; that the executors, other
than your petitioners, were, by reason of their personal
interest in the matter concerned, absolutely disquali-
fied from acting therein, and that it was the right and
the duty of your petitioners to make the investigation
as to securities which apparently should be in the es-
tate, but which, as a matter of fact, are found to be in
the hands of your petitioners' co-executors, and that it
is their further duty to continue said investigation so
as to cover the books which are now said to have been
discovered and which were formerly said to have been
destroyed."

An answer was filed, and a hearing had at which the testi-
mony appearing in this record was taken. On the 18th day
of December, 1918, the Orphans' Court passed the following
order from which Augusta Sonneborn, Henry Sonneborn, Jr.,
and Siegmund B. Sonneborn, executors, and Augusta Sonne-
born and Henry Sonneborn, Jr., individually, appealed:

"The petition of George H. Hutzler and Seymour
Mandelbaum, filed Aug. 31st, 1918, coming on to be
heard, the pleadings were read, testimony taken and
argument of counsel heard.

"And it is thereupon ordered this 18th day of De-
cember, 1918, that all the prayers of said petition be
and hereby are granted; that the bill of Farquhar J.
MacRae for seven hundred and fifty-one dollars and
sixty-four cents ($751.64) be paid out of the estate,
and that the continued employment of said MacRae
and the employment of counsel as prayed in said peti-
tion are hereby ratified and approved, the costs to be
paid by estate."

There is nothing in the record to suggest that the appel-
lants were guilty of bad faith, or that they or either of them
had concealed any part of the estate of the testator.   There
is no charge that Mr. Sonneborn was incompetent to execute
the agreements of January 9th and January 19th, 1915, or
that he was induced to sign them by fraud, undue influence,
or misrepresentations of any kind.   The appellants never
withheld any information from the appellees.   All of the
books and written documents and other facts relating to the
estate of the testator were open to the appellees, but they made
no application for this information, prior to the employment
of counsel.   Without consulting with their co-executors and
without their knowledge they employed counsel and instituted
an investigation which disclosed no facts which they could not
have known without it, and which resulted, or can result so
far as we are able to see in any benefit to the estate.   Such
investigation as was made,—was based upon no charges of
wrong doing against any one, and so far as we can see its fur-
ther continuance at the expense of the estate would be an
unnecessary and useless expenditure.

Where there is no necessity for the employment of counsel
and the institution of proceedings,—as appears to be the case
from this record,—counsel fees and other expenses will not be
allowed out of the estate.   In *Ward vs. Koenig,* 106 Md.
433, it was said that: "Where counsel are employed by ad-
ministrators, and render professional services under such em-
ployment, the administrators are entitled to be allowed rea-
sonable counsel fees, paid or to be paid.   After letters have

been issued, it is conceded that counsel fees are properly allowed in prosecuting and defending claims, in discharge of the duties of the administration.." *Ex parte Young,* 8 Gill, 287. "And this is so though the services may have proved unsuccessful, where there was *reasonable ground* for instituting or defending proceeding."

An examination of the facts contained in this record has led us to the conclusion that there was no necessity for the employment of counsel and the institution of this proceeding, and that the order appealed from should not have been passed.

A motion was filed to dismiss the appeal upon the ground that the order is not subject to appeal under the statutes relating to appeals from the Orphans' Courts of this State. This motion must be denied upon the authority of *Flater vs. Weaver,* 108 Md. 668, wherein it was held that an appeal will lie from an order of the Orphans' Court directing an administrator to pay a sum of money for legal services rendered to him or to the distributees of the estate.

*Order reversed and petition dismissed, with costs.*